# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA      .  CR. NO. H-19-148-1
                                   .  HOUSTON, TEXAS
 4   VS.                           .
                                   .
 5   GONZALO JOSE JORGE            .  NOVEMBER 10, 2021
     MORALES-DIVO                  .  11:15 A.M. to 12:14 P.M.
 6


 7                      TRANSCRIPT of SENTENCING
 8             BEFORE THE HONORABLE GRAY H. MILLER
                    UNITED STATES DISTRICT JUDGE
 9


10   APPEARANCES:  (All participants wearing a mask)
11   FOR THE GOVERNMENT:             DREW BRADYLYONS
12                                   Fraud Section
                                     Department of Justice
13                                   1400 New York Avenue
                                     Washington, D.C.  20005
14


15   FOR THE DEFENDANT:              STEPHEN JAMES BINHAK
16                                   Law Office of Stephen James
                                        Binhak PLLC
17                                   1221 Brickell Avenue
                                     Ste 2010
18                                   Miami, Florida  33131

19                                   ANDREW H. KAUFMAN
                                     Stephen E. Kaufman PC
20                                   277 Park Avenue
                                     47th Floor
21                                   New York, New York  10172

22                                   ROBERTO MARTINEZ
                                     Colson Hicks Eidson
23                                   255 Alhambra Circle
                                     Penthouse Suite
24                                   Coral Gables, Florida  33134

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

1                        <u>APPEARANCES CONTINUED</u>

2  FOR THE DEFENDANT                SANDRA GROSSMAN

3

4  OFFICIAL COURT INTERPRETER:      RAMON DEL VILLAR, JR.
                                       (On standby)

5

6

7  PROBATION OFFICERS:              DEYANIRA LOREDO
                                    CHRIS HOPKINS

8

9  COURT REPORTER:                  KATHY L. METZGER
                                    U.S. Courthouse

10                                      515 Rusk
                                     Room 8004

11                                      Houston, Texas   77002

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2          (Open court, interpreter on standby)
 3              THE COURT:  All right.   The Court calls Criminal Case
 4     19-148, which I will note has now been unsealed pursuant to the
 5     request.   This is United States of America versus Gonzalo
 6     Morales.
 7                  Who's here for the government?
 8              MR. BRADYLYONS:  Good morning, Your Honor.   Drew
 9     Bradylyons on behalf of the government.
10              THE COURT:  Bradylyons?
11              MR. BRADYLYONS:  That's right, Your Honor.
12              THE COURT:  Okay.   Good.   Good morning.
13              MR. BRADYLYONS:  Good morning.
14              THE COURT:  All right.   And for the defendant?
15              MR. MARTINEZ:  Your Honor, good morning.   May it
16     please the Court.
17              THE COURT:  Yes, sir.   Come up.
18              MR. MARTINEZ:  Your Honor, good morning.   My name is
19     Bob Martinez.
20              THE COURT:  Mr. Martinez.
21              MR. MARTINEZ:  I'm also here with attorney Stephen
22     Binhak and Andy Kaufman.
23              THE COURT:  All right.
24              MR. MARTINEZ:  My client is right outside.   We were
25     waiting for the conclusion of this proceeding.
```

1          THE COURT:  All right.

2          MR. MARTINEZ:  And I believe that Mr. Binhak, who will
3    be addressing the Court, stepped out momentarily to go to the
4    restroom before coming back into the courtroom.

5          THE COURT:  Okay.  Very good.  Thank you.

6          MR. MARTINEZ:  Mr. Morales is here.  Also counsel
7    Sandra Grossman.

8          THE COURT:  Okay.  Very good.  Welcome to you all.

9               Mr. Morales, come forward, please.

10         MR. MARTINEZ:  And Mr. Morales speaks English, Your
11   Honor, but he would benefit from a translator.

12         THE COURT:  Fine.  No problem.

13         MR. MARTINEZ:  Mr. Binhak is in the restroom.

14         THE COURT:  Okay.  We'll wait for him.  Y'all can sit
15   while we're waiting, that's fine.

16              All right.  Mr. Binhak?

17         MR. BINHAK:  I'm sorry I'm late.  I was in the
18   bathroom.

19         THE COURT:  No worries.  We were running a little
20   overtime on the last one, so not a problem.

21              All right.  Are we ready to go, Mr. Binhak?

22         MR. BINHAK:  Yes, sir.

23         THE COURT:  All right.  Mr. Morales, if you want to
24   stand up here or you can do it from the table, if you prefer,
25   it's fine.

 1             *MR. BINHAK:*  If it's okay with you, I'd prefer to
 2   stand up here.
 3             *THE COURT:*  No, that's fine.  Absolutely.
 4             *MR. BINHAK:*  It's hard for me to hear, and we all have
 5   our masks on, so.
 6             *THE COURT:*  I understand.  I understand.
 7             All right.  So, Mr. Morales, is present.  Do you
 8   have an interpreter who is interpreting for you, Mr. Morales?
 9             *THE DEFENDANT:*  I understand okay.
10             *THE COURT REPORTER:*  Can he use the microphone, Judge?
11             *THE COURT:*  Yes.  There's a microphone right there.
12   Go ahead.
13             *THE DEFENDANT:*  Yeah, I understand, Judge.
14             *THE COURT:*  You understand English?
15             *THE DEFENDANT:*  Yes.
16             *THE COURT:*  But we do have an interpreter standing by,
17   if you need one.  All right.
18             *THE INTERPRETER:*  That's correct, Your Honor.
19             *THE COURT:*  All right.  So, Mr. Morales, this is a
20   sentencing hearing in your case.  I want to start by briefly
21   describing the Court's sentencing procedures.  The U.S. Supreme
22   Court has held in the *Booker* case that the sentencing
23   guidelines are advisory and not mandatory for judges.  *Booker*
24   requires the sentencing court to consider the guideline ranges,
25   but it permits the court to tailor the sentence in light of

1   other statutory concerns as well.

2             The Court in the exercise of its sentencing

3   discretion will rely on the factors which are set out in

4   Section 3553(a) to fashion an appropriate sentence in your case

5   to achieve the congressionally mandated purposes of sentencing

6   as set forth in the Sentencing Reform Act of 1984.  The Court

7   will endeavor to faithfully apply the directives within the

8   guidelines in their entirety to determine the total offense

9   level and the criminal history category under the guidelines.

10  Thereafter the Court will exercise its sentencing discretion to

11  determine the appropriate sentence.  In doing so, the Court

12  will give considerable weight to the sentencing range

13  calculated under the guidelines.

14            Any comments by the Court in the course of the

15  sentencing are not to be construed as an indication that the

16  Court believes that the guidelines are mandatory or that they

17  constrain the Court's ultimate sentencing discretion.

18            The standard of proof for factual findings in

19  connection with sentencing is preponderance of the evidence.

20  And in determining whether that standard has been met, a

21  presentence report is generally considered sufficiently

22  reliable to be used by a trial court as evidence in making the

23  factual determinations which are required by the advisory

24  guidelines.

25            Now, in your case I have reviewed the presentence

1    report, which was prepared by the probation department.

2             No objections by the government?

3             MR. BRADYLYONS:  That's correct, Your Honor.

4             THE COURT:  All right.  Let's see.  I think you did --

5    it wasn't filed as a formal objection, but as part of your

6    sentencing memorandum, I think you filed an objection with

7    respect to the guideline calculations, Mr. Binhak?

8             MR. BINHAK:  Yes, sir, we did.  We did.

9             THE COURT:  All right.

10            MR. BINHAK:  Judge, we don't believe that the PSI

11   reflects the agreed factual basis for the plea that's in

12   Mr. Morales' plea agreement.  Specifically, the United States

13   and Mr. Morales agreed that the total amount of bribes that

14   should be associated with him and attributed to him was

15   $629,000 and that Mr. Morales received the benefit of at least

16   2.534 million dollars as a result of his conduct.  And that's

17   in the plea agreement at 14.  And those are the facts that came

18   through in the colloquy.

19            And I want to be a hundred percent clear, we are

20   embracing that.  We are not running away from that.  What

21   Mr. Morales said at the plea colloquy and in his plea

22   agreement, he agrees with 100 percent.

23            By contrast, the PSI we believe uses a different

24   methodology and it looks to the conduct of the co-defendant

25   Mr. Gonzalez-Testino and more generally it says at Paragraph

1  27, "The total estimated benefit received from the bribery of

2  PDVSA officials and contracts awarded to companies owned or

3  partially owned by Gonzalez-Testino is 38.9 million dollars."

4          Now, Judge, in the Fifth Circuit, to hold a

5  defendant accountable for conduct of others, the government

6  must establish that the defendant agreed to jointly undertake

7  criminal activities with a third person and that the particular

8  activity was within the scope of the agreement.  That's the

9  *United States versus*, and I apologize for not pronouncing its

10  name right, but *Evbuomwan*, which is at 9 -- it's E-v, like in

11  Victor, b, like in boy, u-o-m, like in Mary, w-a-n, which is at

12  992 F.2d 70.  It's a Fifth Circuit case from 1993.  And that's

13  citing 1.1 -- 1.B -- 1B1.3, and it essentially says what I just

14  said, and it's in our brief.

15          Also, in *United States versus Rivera*, which is

16  898 F.2d 442, also a Fifth Circuit case from 1990, the

17  defendant, Mr. Rivera, pled guilty to a distribution of heroin,

18  and the court at -- the sentencing court at sentencing, the

19  district court adopted the factual findings of the PSI and

20  concluded that Mr. Rivera distributed all 224 grams of heroin

21  that were described in the indictment.  And the Fifth Circuit

22  in that case reversed.  And what it said is that the record

23  showed that on this particular date Mr. Rivera admitted selling

24  .28 grams of heroin and said that he should be essentially held

25  to that standard.

1          We believe Mr. Gonzalo Morales' case presents a

2    very similar situation.  As I said, we absolutely and

3    completely abide and adopt what he's pled guilty to and we

4    think he should be held accountable for that.  And if that's

5    the case and you apply the guidelines, the benefit to him is

6    2.534 million dollars, which under the circumstances would mean

7    that he should receive 12 months under 2X1.1, the conspiracy

8    guideline, and 2C1.1, FCPA, because you cross-reference from

9    the conspiracy to the FCPA, two points because the scheme

10   involved more than one bribe, and then 16 additional points

11   under 2B1.1(b)(2), because he received --

12          *THE COURT:*  That's all right.

13          *MR. BINHAK:*  That's fine.  I just want to make sure

14   you do everything you need to do.  I recently did a trial with

15   masks on and you just can't tell anything.  All you see is

16   eyebrows moving.

17          So anyway, the benefit would be greater than

18   1.5 million dollars and then, of course, followed by a

19   three-point reduction for acceptance of responsibility,

20   assuming that you grant the government's motion in that regard.

21   That would make the total 70 to 87 months, which is where --

22          *THE COURT:*  You're still capped at 60 months.

23          *MR. BINHAK:*  Yes, sir.  So I don't want to make a

24   distinction without a difference and running down a rabbit hole

25   for no reason, but we do think it's important because I know

1  how seriously -- I actually just saw the questioning that you

2  had just a moment ago, how seriously you take the parity

3  between the cases and we think this is a very important

4  indicator of where Mr. Morales sits in the grand scheme of

5  things.  So we don't think -- even though it will have no

6  effect ultimately on the actual calculation of the guidelines,

7  we think it's a very important proxy for where he stands in

8  the -- among the other participants in the crime.  So for that

9  reason, I appreciate you listening to that and that's our

10  position.

11          THE COURT:  All right.  Is that the only objection you

12  have?

13          MR. BINHAK:  Yes, sir.

14          THE COURT:  Okay.  Fine.  Thank you.

15              Mr. Bradylyons.

16          MR. BRADYLYONS:  It's the government's position, Your

17  Honor, that the PSR correctly calculates the sentencing

18  guidelines.  That figure of approximately 38 million dollars

19  reflects the improper benefit that was reasonably foreseeable

20  and jointly undertaken criminal activity between Mr. Morales

21  and his principal co-conspirator Mr. Gonzalez.

22              The government would note that we agree with

23  defense counsel that the personal benefit figure is important

24  for the Court to consider in avoiding unwarranted sentencing

25  disparities.  And that figure here is about two and a half

1   million dollars.  That being said, the number that the PSR

2   identified of approximately 38 million dollars is the correct

3   figure for loss amount purposes.

4          That number has not always been ascertainable in

5   these cases.  Where it has been in the cases of Mr. Hernandez,

6   for example, and Mr. Millan, the Court did use that figure for

7   purposes of the PSR.  Those figures are astronomical.  They're

8   102 million dollars and they are 145 million dollars.  The

9   personal benefit figures for those two defendants here, two and

10  a half million dollars, were also relevant data points for the

11  Court.  But, Your Honor, it's the government's position that

12  that 38 million dollars is correct.

13      *THE COURT:*  All right.  I've looked at this.  Of

14  course, I'm very familiar with this case and how these amounts

15  are calculated.  So I think the PSR calculated it correctly.

16  So I'm going to overrule your objection on that, Mr. Binhak.

17  But the figure that I really take into account more than just

18  the gross loss amount figure is the personal benefit figure,

19  and that kind of drives my desire to keep the defendants

20  relatively -- the ones that are equally culpable, keep them in

21  the same range.  So even though I'm going to overrule your

22  objection to it, the personal benefit figure I think is agreed

23  at about two and a half million dollars.

24      *MR. BINHAK:*  Yes, sir, slightly over.  2.543 is the

25  number, and it's in our briefs and it's in the --

1           THE COURT:  Right.

2           MR. BINHAK:  And thank you for ruling on that, I

3   appreciate it, and I'll address that later.  I'm sure you'll

4   give me the opportunity to do that.

5           THE COURT:  Of course I will.

6           MR. BINHAK:  I know you will.

7           THE COURT:  Of course I will.

8               Okay.  So as a result of overruling the

9   objection, the Court will adopt the presentence report and find

10  that the total offense level is 33 with a criminal history

11  category of I.  That yields a recommended period of

12  imprisonment of 60 months pursuant to the five-year maximum for

13  this particular offense; a period of supervised release of one

14  to three years; a fine range from 17,500 to $77,852,000; and a

15  special assessment of $100.

16              All right.  I note in this case the government

17  has filed a 5K motion asking me to give 25 percent off, to a

18  sentence of 45 months; is that correct?

19          MR. BRADYLYONS:  That's correct, Your Honor.

20          THE COURT:  All right.  What would you like to say

21  about that on behalf of the government?

22          MR. BRADYLYONS:  Your Honor, from his first meeting

23  with law enforcement, Mr. Morales was forthright, truthful,

24  honest, and provided fulsome information.  He debriefed with

25  the government on multiple occasions.  The information he

1  provided was corroborated, and it corroborated the information

2  provided by others.

3            Mr. Morales was a notably eager cooperator.

4  Through counsel there were months where he would provide

5  information to law enforcement half a dozen times.  That law

6  enforcement was provided -- I'm sorry.  That information was

7  provided to a multitude of law enforcement agencies.  And in

8  light of that, Your Honor, the government requests that a

9  departure of 25 percent to reflect that substantial assistance.

10           *THE COURT:*  All right.  Thank you.

11           Mr. Binhak.

12       *MR. BINHAK:*  I just want to make sure I go in the way

13  you are accustomed to doing sentencings.  Would you like me to

14  address all of my remarks at this time?

15       *THE COURT:*  All your sentencing recommendations and

16  remarks and then I will hear from the defendant.

17       *MR. BINHAK:*  Yes, sir.  And Mr. Morales does want to

18  address the Court.

19           *THE COURT:*  And I have read through your book.

20       *MR. BINHAK:*  I know you have.  I'm not going to repeat

21  it.  We gave you a lot of stuff and we just wanted to be super

22  thorough.

23            Judge, first, I want to thank you for having us

24  today and for granting extensions on behalf of Mr. Morales so

25  that he --

1        *THE DEFENDANT:*  I need to sit down.

2        *MR. BINHAK:*  Okay.  He needs to sit down.

3        *THE COURT:*  Fine, no problem.  Please.

4        *MR. BINHAK:*  And granting him the extensions for

5   COVID, so that we could all be here in person.  It's very

6   important for Mr. Morales to address you personally, and we

7   appreciate that.

8              You know, Judge, throughout COVID, you know, I've

9   been working through my home through a computer screen and I'm

10  been thinking a lot about the ritual of court and why it's

11  important and why we do things a certain way.  You know,

12  there's a mundane reason why a big curtain goes up before a

13  play or the conductor taps the baton or tells you things are

14  going to start or even why the judge comes in and we stand up.

15  But there's another reason --

16       *(Defendant stood back up)*

17        *THE COURT:*  Have a seat.  It's fine, please.

18        *THE DEFENDANT:*  Thank you.

19        *MR. BINHAK:*  But there's a much more important reason

20  for that.  It tells you how serious the event is that we're

21  about to embark on.  And as a defense attorney at a sentencing,

22  it's my job to demonstrate to you that Mr. Morales takes it

23  that seriously.  He doesn't take it as just a tap of the baton

24  and we move on, but he understands the gravity of the situation

25  that we're in and the gravity of what we're doing here.

 1          And I think we will be able to demonstrate by
 2    telling a few things about his life and the way he's conducted
 3    himself in this case, that he has committed to not just the
 4    form of the ritual of the cooperation and the guilty plea and
 5    sentencing, but the true substance of that.
 6          Mr. Morales pled guilty to one count of
 7    conspiracy to violate the Foreign Corrupt Practices Act in
 8    violation of 18 U.S.C. 371.  He raised money for companies that
 9    procured equipment for PDVSA, and the companies used this money
10    to procure equipment that they -- that PDVSA had ordered and
11    then they would sell that -- that back to PDVSA at an inflated
12    price and then they would use that inflated price to make
13    improper payments and including paying back Mr. Gonzalez --
14    Mr. Morales and his investors where he raised the money from.
15          Mr. Morales violated United States law because he
16    knew that these companies were paying bribes to officials at
17    PDVSA and its procurement division Bariven in order to obtain
18    the contracts in the first place to expedite payments and so
19    that Bariven would award U.S. dollar-denominated contracts
20    instead of Bariven, which was far more desirable for obvious
21    reasons.
22          Now, Mr. Morales' history in Venezuela before he
23    ever came to the United States is a very good example, we
24    think, about how his character is to participate meaningfully
25    and not just go through the motions of walking through the

1   ritual.  Mr. Morales was born in Venezuela.  His father was a

2   mechanical engineer and a professor of engineering at various

3   universities.  At 98 years old his father remains a member of

4   the prestigious academy that runs engineers.

5               His mother was a diplomat and she was Venezuela's

6   ambassador to Peru.  This gave him a very privileged start.

7               And Mr. Morales created a number of successful

8   construction companies.  He built single family homes,

9   apartments, commercial buildings, and an airport.  And as a

10  result of that success, he could have continued to stay in

11  the -- where he was and run his business and be a very

12  successful man.

13              In 2006 he met a woman, Fabiola Colmenares, and

14  at that time she was widely known.  And in 2008 Ms. Colmenares

15  founded the Popular Will party.  And that party became a

16  significant opposition party in the government.

17              And at this time Mr. Morales was also alarmed by

18  the Chavez government, even though he could have continued to

19  benefit from it and he supported the movement to maintain

20  democracy in Venezuela.  Through the activities of the VP, in

21  2009 Mr. Morales learned from Venezuela's former intelligence

22  director, Miguel Rodriguez Torres, that Mr. Morales would have

23  to leave the country immediately or be in extreme danger for

24  his opposition work.

25              In short, long before he was ever involved in

1  this case, he left a comfortable and privileged life in his

2  industry to challenge the government.  And his conduct forced

3  him to leave the country.  He was not going through the

4  motions.  He was meaningfully participating.

5          We think the same is true, as an example, with

6  his family life.  Mr. Morales, after he came to the United

7  States, married a woman.  He adopted two children, age 6 and 8.

8  But despite the divorce, he's still very close to his ex-wife.

9  He's the father of the two young stepdaughters, and he provides

10  for them financially.

11          And we've read the letter from his wife.  And I'm

12  sure you've also read the letter from the young woman -- the

13  young girl, Isabella's therapist.  Isabella is the

14  developmentally challenged situation.  And, you know, a lot of

15  people when they're faced with a divorce or a special needs

16  child, they withdraw.  And Mr. Morales has not gone through the

17  motions.  He stepped in, and he's fully participated in a

18  meaningful way.  And as you can see from the letter from the

19  therapist in particular, he is an extraordinarily important

20  force in Isabella's life.

21          I think the media -- his media business also

22  shows this situation where he's just not going through the

23  motions.  He is fully all in and part of the process.

24          In 2010 Mr. Morales founded *Venezuela al Dia*,

25  which started as a printed newspaper in a western county near

1  Miami.  And the paper became the largest circulation of

2  Venezuela news.

3          Later he founded ElPolitico.com, which is a news

4  website that focuses on Latin American news; also

5  Descifrado.com, an economic news website; and the

6  Miamidiario.com.  He also founded VPITV, which is a broadcast

7  station that was centered with Ms. Colmenares in Venezuela.

8  And the whole purpose of this was -- of all these things was to

9  be opposition to the government.

10         Now, my point here is that he could have gone out

11  and made a *People* magazine.  He could have made a lot of money

12  selling celebrity news or sports or whatever, but he

13  particularly focused on making change in his own country and he

14  did it in a very serious way, so much so that the government

15  shut down the VPITV and has shut down access to his outlets in

16  Venezuela.

17         He has provided through these networks critical

18  support to Mr. Guaidó, who has written a letter on his behalf,

19  and the VP, the political party that he was around for the

20  founding of.  And he has helped to expose Maduro government's

21  human rights abuses and criminal behavior.  All three founders

22  of the VP wrote to the Court, and you have those letters.

23         Then you saw the letter from Jorge Antonio

24  Betancourt Silva, which is a critical letter and shows in great

25  detail and we went through it in great detail in our

 1   submission, about how critical this media presence is in

 2   Venezuela and how his -- how Mr. Morales' journalists and news

 3   operations have exposed corruption, crime, and lack of

 4   democracy in Venezuela, also, how Mr. Morales has helped with

 5   the logistics to support very important humanitarian aid and

 6   political efforts in the country.

 7            And Mr. Silva further describes the unique

 8   political, sensitive political intelligence information that

 9   Mr. Morales has been able to expose and specific illegal

10   activity which is in the Maduro regime.  And that's in our -- I

11   won't read it again.

12            But I think what is the most important

13   achievement that Mr. Morales has had through this effort --

14   through these efforts, and we've identified one with the letter

15   from Gilber Alexander Caro Alfonzo, the Venezuelan state of

16   Miranda representative who was smuggled -- or Mr. Morales

17   helped to smuggle out of Venezuela to avoid torture is probably

18   the best example of him not just going through the ritual but

19   in putting himself out at personal risk and personal harm to

20   save other people who would have a very horrible fate

21   otherwise.  And Mr. Caro Alfonzo is not the only one.  He's

22   just the one that we chose to show you.  There are several

23   more.

24            So the point here that I'm trying to make,

25   Judge, is that what you're going to hear when you speak to

1   Mr. Morales, and I encourage you to ask any questions that you
2   have of him, is a man of substance, who is not going through
3   the motions.  He is not the kind of person who's just going to
4   get up and say what you need to hear here and just open the
5   curtains so the show could start.  This is a serious man who
6   feels deeply shameful for what he's done.

7                And that brings us to his immigration status and
8   a particularly shameful part of -- particularly for him a
9   source of great shame.  What Mr. Morales will tell you is that
10  when he left Venezuela because he had to, he came to this
11  country.  And this country was a refuge for him to be safe, so
12  that he could prefer democracy.  And it is a sense of great
13  shame for him that he violated the laws while he was here, and
14  he considers that a particularly embarrassing part of this
15  situation.

16               And if he were to go home, he -- the last time he
17  went home, he was followed by the police.  He believes he would
18  be tortured.  And as a result of his asylum application and the
19  things that he's done right in the United States,
20  notwithstanding this colossal -- his crime is really the only
21  way to say it, he has been a productive member of the U.S. and
22  particularly the Venezuelan/U.S. community so much so that just
23  at the end of October, in the last 15 days or so, the
24  Department of Homeland Security gave him a deferred action
25  letter, which is a relatively rare thing to get.  And it says,

1   "You have been granted deferred action as an act of discretion

2   by and for the administrative convenience of the United States

3   government."  And that's partially because, I think, of his

4   cooperation and the cooperation that may happened before, but

5   no matter how much you cooperate, if you're a bad guy, you're

6   not going to get that.

7          And there's also a work permit coming there.

8   And, of course, this does not bind you at all, no question at

9   all.  But I think it shows an indication of at least what one

10  part of the United States government thinks about whether

11  Mr. Morales can be a productive contributing member of our

12  society.  And, so, I think that's an important thing.

13         Then we can move on to the cooperation that

14  Mr. Morales gave.  As the United States has just told you,

15  Mr. Morales cooperated from the beginning.  He did something

16  that most defense lawyers would really pull their hair out if

17  they saw, which is he went in without immunity and his lawyers

18  on the very first meeting and he disclosed what he was doing

19  and who he was doing it with.  In my experience, Judge, as both

20  a prosecutor and a defense attorney, I've been doing this for

21  30 years, I hope I don't look like that old, but you rarely see

22  that.  I've rarely seen that in my experience.

23         Then after fully disclosing what he did, I think

24  is where he went on to do some exceptional things for the

25  United States.  Through his network of contacts and media

outlets and relationships in Venezuela, sometimes at the
request of the investigators but sometimes on his own
initiative, Mr. Morales provided more than a hundred very
sensitive documents, including passports, Venezuela immigration
records, flight plans, and airplane tail numbers, internal
PDVSA documents and other Venezuelan documents, which gave the
United States in many -- I won't say many, in several key
instances its first glimpse of what was going on in real time
in Venezuela.

Now, I know that you see people come and
cooperate on a regular basis and it's -- you know, a very
distinguished judge in our district, who's now on the Eleventh
Circuit, Judge Marcus, used to say, There's proactive, going
out and putting yourself in harm, putting on a wire, having
conversations, testifying at trial, these are the highest
levels of cooperation, as opposed to just sitting in a room and
just telling some people what you did.  Well, this I would
submit to you, because he did not have the chance to testify,
that's not his situation, he was not in a position to make
recordings, this is that kind of cooperation.  This is putting
yourself out and getting the kind of cooperation that most
people never are able to give to the United States.

And we give tremendous credit to people who
testify, but this is, I think, at another level.  Let me give
you just -- let me highlight a couple of specific examples from

1    our papers.

2              In September of 2019 Mr. Morales smuggled, with

3    other people's help, out of Venezuela a 19-page letter which is

4    handwritten by the former Minister of Oil and President of

5    PDVSA.  And this letter outlined areas of Venezuelan government

6    corruption, including the details of Alex Saab's role as a

7    money launderer for President Maduro.  And Mr. Saab has

8    recently made his way back to Miami, Florida, where he will

9    answer in part for those very allegations, I believe, as a

10   casual but informed observer.

11             In February 17 -- on February 17th of 2021,

12   Mr. Morales provided to the United States a report outlining

13   the Venezuelan anti-aircraft missile defense program.  Among

14   other things, this report included a description of the Russian

15   IGLA-S system that's installed in Venezuela with detailed maps

16   identifying how the system and the missiles are deployed.

17   That's an extraordinary thing.  I'm sure the government had

18   great use for it and not just at the Department of Justice but

19   in other places.

20             In March of 2021, Mr. Morales provided to the

21   United States information regarding meetings between Venezuelan

22   government officials and suspected Ukrainian money launderers,

23   including the flight plans, the passenger names, and tail

24   numbers associated with their travel to Venezuela.

25             And I believe just based on the conversations

1    that I've had indirectly with the agents, that in 2019, I

2    believe it was, that Mr. Morales was the first person to tell

3    the United States how Venezuela was smuggling gold out of the

4    country and literally had pictures of boxes of gold bars on

5    private aircraft leaving the country.  He was able to obtain

6    those and the tail numbers and who were bringing the planes and

7    when they were leaving, and we handed those over to the United

8    States.  And that was a major effort by Venezuela that was

9    beginning to avoid the OPEC sanctions that were -- that had

10   just recently begun to really strengthen in at that time.

11         We believe this exceptional cooperation extends

12   far beyond the normal cooperation that you see, as I said, and

13   I think also it's just another example of how you're seeing a

14   man who's serious and is not just making stuff up to please you

15   now.  This is a lifetime of doing good things and in the midst

16   of a horrible and tragic fundamental error of judgment that

17   caused him to commit a crime.  And that was just wrong, and I

18   think he'll tell you that.

19         And I think, as this woman who was just being

20   sentenced, and I don't know her name, said, that this does not

21   define me, this one act.  Well, I think it's fair to say that

22   the crime that Mr. Morales committed doesn't define the entire

23   person.  It's part of the person.  It's a flaw that he engaged

24   in, but there are many other pieces that are worthy of

25   recognition.

 1          So the other thing I would like to touch on at
 2   this point, Judge, is Mr. Morales' health.  In late February of
 3   2021, he was literally picked up at his hospital -- at his home
 4   and brought to the hospital and was -- well, to be blunt, his
 5   brother called me and said that he was about to die.  That's
 6   what I heard about him.  His recovery is really, according to
 7   the doctor, it's -- I hope you had a chance to read the --
 8   excuse me, to look at the video and I can see by your nodding
 9   that you did, and to read the letter, it was really just
10   essentially a miracle that he is sitting here today.  And for
11   that Mr. Morales is fundamentally and extraordinarily grateful.
12          You know, Judge, I am not in the habit and I
13   would not come in front of you and say someone shouldn't go to
14   jail because they're going to die.  I'm not saying that.  And
15   I'm also not saying that Mr. Morales should get a pass because
16   he's been ill.  But I think he should an accommodation, and
17   that's what we're really asking for.  And I'll get back to that
18   in just one second.
19          So, I'd just like to touch now just briefly on
20   the actual crime so we just put this all in context of this
21   horrible decision that he made, which really has derailed his
22   life in a fundamental way.  As I said, starting in 2012
23   Mr. Morales began working with his friend Jose Manuel Gonzalez
24   Testino, a name that I know that you know, and he was investing
25   in Mr. Gonzalez's companies, which were bidding for contracts

with PDVSA.  And when Gonzalez would win a bid, Morales would
identify and secure capital and some of them, but not all, but
some in order to procure the supplies that PDVSA ultimately
were selling.

Now, let there be no doubt, this is why we're
here.  Mr. Morales knew that Mr. Gonzalez was paying --
providing bribes and paying bribes to PDVSA officials,
including Cesar David Rincon-Godoy, another name that I know
that you know, who was the general manager of PDVSA's
procurement office called Bariven.  Mr. Gonzalez, as I said
earlier, paid these bribes so that Mr. Rincon would direct
contracts to Mr. Gonzalez's companies.  He would give these
contracts priority for payment and that they would also get
dollar-based contracts far more valuable than bolivars.

For the investments that Mr. Morales made, there
were $629,000 worth of bribes that were involved.  And I am not
trying to revisit your ruling before.  I'm just trying to give
you the context of his role.

Mr. Gonzalez also paid bribes -- agreed to pay
bribes to an entity called "The Group," which I'm sure is a
phrase that you've heard before.  These were the individuals
who controlled Bariven.  And, again, let there be no doubt,
Mr. Morales knew about these bribe payments because he met in
2012 with Mr. Luis Carlos de Leon, who was a member of The
Group.  So, he knew it was going on.

During the meeting Mr. de Leon told Mr. Morales
that the Morales/Gonzalez companies would have to pay The Group
a 10 percent fee, surcharge, bribe, gratuity, whatever word you
want to use, but there's the crime, the value of the contracts
that PDVSA awarded going forward.  And after Mr. Morales told
Mr. Gonzalez about that 10 percent payment, Mr. Gonzalez
confirmed to Mr. Morales that these payments would be made.
So, as I said, we are not in any way walking away from
responsibility for the conduct here.

And along these lines, at a meeting with
Alejandro Isturiz Chiesa, Mr. Isturiz provided payment
instructions to Mr. Morales and Mr. Morales relayed those
payment instructions to Mr. Gonzalez.  And Mr. Gonzalez
confirmed that he was making the payments.

That relationship between Mr. Gonzalez and
Mr. Morales lasted for approximately two to three years.  And
Mr. Morales received, I can give you the exact number,
$2,524,365.65 to his bank.  That's his personal benefit that
arrives from this, which is a significant number, and I'll get
to that with respect to the others in just a second.

Judge, we believe that you should downward depart
on the facts that I've just laid out to you.  First, I
understand it's an Eleventh Circuit case, but in *United States
v. Rodriguez*, when a person doesn't get any credit for the
three points and it just sort of evaporates, the judge has

 1  authority to incorporate that into a downward departure and
 2  take account of that.
 3           We're asking that you make that part of your
 4  consideration to reduce the sentence.  There's no question in
 5  my mind that Mr. Morales made immediate acceptance of
 6  responsibility, and I think that should be covered in his
 7  sentence.
 8           The second thing we would like you to consider is
 9  the placement in the scheme.  Mr. Morales was a financier.  And
10  I'm not minimizing here.  That's important.  You know, things
11  don't get done without dollars to finance.  But he was not an
12  architect of the broader scheme.  He didn't arrange the
13  specific relationships that caused the bribes.  He did not
14  carry money around in bags to give the bribes.
15           We think, Judge, that if you were to sentence him
16  in the heartland of the people that you've sentenced, he would
17  be similar to the Millan case, where there was an FCPA
18  violation, also, 18 U.S.C. 371, with a personal benefit of
19  $533,000 and change.  Millan got three years of probation.
20           And similar, the Beech case, which is also a 371
21  FCPA conspiracy, where Beech received an $833,000 personal
22  benefit.
23           We think Millan -- well, you will recall, Judge,
24  that Millan received three years probation, but 500,000 is
25  substantially less than 2.5 million.  And Beech received 12

1   months and a day for imprisonment, $833,000 worth of personal

2   benefit, which is about 40 percent of where Mr. Morales is.

3                We believe, Judge, that without the health issue,

4   that Mr. Morales would rightly fall into a prison sentence of

5   one -- of 12 months and 1 day.  And we think that would fit in

6   line.  And the reason, even though Mr. Morales is greater

7   personal benefit than Mr. Beech, we believe that -- and

8   although they are both getting the same reduction request for

9   cooperation, we believe that Mr. Morales' cooperation is

10  extraordinary and we believe he should get a slightly -- well,

11  a more significant reduction than the government is asking the

12  Court for.

13               I've cited you the Sentencing Commission's

14  general rules and the statistics on what happens for people

15  who've cooperated, and it's almost 70 percent is the average

16  across the United States.  So I don't think this is out of line

17  with what's going on across the United States for cooperators

18  in bribery cases, but I certainly I understand that you want to

19  keep the parity within this case.  So, and that average

20  reduction is 77 -- 76.7 percent.  Also, the acceptance of

21  responsibility.

22               So, where we're asking for the accommodation, I

23  said to you before, the accommodation, we believe that instead

24  of a custodial sentence for that 12 years and -- excuse me, 12

25  months and 1 day, goodness gracious, that's a mistake, right,

1    12 months and 1 day, which would probably allow Mr. Morales to

2    leave custody sometime in the eleventh month with credit, tenth

3    or eleventh month.  We think that in order to allow him to

4    continue to have the therapy that he needs, the nutrition that

5    he needs and if something horrible happens, to have access to a

6    hospital, that you place him under home detention for a period

7    of anywhere from 10 to 12 months.  You may decide that it's not

8    enough -- that he shouldn't get credit because he's going to be

9    home as opposed to somewhere else.  So, you know, my

10   recommendation is 11 months, because that's what I think he

11   would get back if he would be in jail, but I'm not going to sit

12   here and quibble over the month.  So, home detention.

13            Also -- and that is not -- I think what the

14   message that sends is I'm giving the same sentence that I would

15   ordinarily give to this person, but I'm giving an accommodation

16   to accommodate his health.  But what's important also, and this

17   is not in our brief and I apologize for not putting it in, it's

18   my error, is that rather than -- we don't want anybody to think

19   that Mr. Morales is sitting at home watching TV.  We want to

20   turn this into something productive.  And I don't think it's

21   enough for him to sit home and work on his businesses even if

22   it will help democracy in Venezuela, which is very important,

23   but that's just businesses he owns and that can make him money.

24   I want you to be sure that there's (A) a productive use of his

25   time for the community and at large and (2) a message that

1   nobody got anything off free.

2          And I think for every week that he's home -- or

3   every month, he should have, whether you do it 30 hours a week

4   or 120 hours a month, however you show, he should have

5   community service.  And I think that community service should

6   be hands-on specific work with underprivileged people.  Because

7   Mr. Morales grew up in such a privileged side, I think the best

8   way for him to give back is to people who really didn't have

9   the advantages he did.

10         We have a specific suggestion.  There's an

11  organization in Miami called the Camillus House.  It feeds

12  homeless and houses homeless people and provides medical care

13  to 12,500 people in an average year.  50,000 meals a month or

14  something like that.  We think that either that, Camillus

15  House, or some place like it on a -- basically on a full-time

16  basis.  That would be the only reason he would be able to go

17  out of the house other than doctors, lawyers, and church.  It

18  would be a way to accommodate without in any way undermining

19  the seriousness of what's happened in this case.

20         So, Judge, I want to end with where I began, and

21  thank you so much for being so generous with your time.  I've

22  been a little longer, but my wife says that that's a genetic

23  problem for me.

24         *THE COURT:*  It happens in our profession.

25         *MR. BINHAK:*  But I want to end where I started.  I

1  want to introduce you, when you're ready, if you want to hear

2  from the government first, but I want to introduce you to

3  Mr. Morales.  I want you to feel free to ask him any question

4  you want.  He has some things that he would like to say to you.

5            And I just want to -- I hope that I have -- I

6  hope that I've discharged my responsibility in demonstrating to

7  you that this is not a man who's just waiting for the curtain

8  to go up so he can do something.  I hope that I've set the

9  stage, pardon the pun, for him to show you and demonstrate with

10 his own words and with his own heart that he's extraordinarily

11 remorseful for, really no other way to say it, but a stupid,

12 stupid, greedy act, and that he has tried since the moment that

13 he could to make it right and he would like to continue to make

14 it right going forward.  So if you have any questions, I'm

15 happen to answer them; otherwise, I'll just -- I'll shut up.

16      *THE COURT:*  All right.  I think I understand

17 completely your recommendation with respect to sentencing.

18 Before I hear from Mr. Morales, I'm going to give

19 Mr. Bradylyons an opportunity to say anything that he would

20 like to say to sum up on behalf of the government based on what

21 we've heard from the defense.

22      *MR. BRADYLYONS:*  Yes, Your Honor.  Just briefly and

23 without going back into what's in our sentencing memorandum, we

24 do believe that this was a significant bribery scheme and that

25 Mr. Morales played a significant role in it.  He was not merely

1  a bystander.  He had conversations with members of the

2  management team at PDVSA and Bariven.  In light of that, the

3  government recommends a custodial sentence.

4          I think the four most relevant sentences for the

5  Court to consider when fashioning a sentence for Mr. Morales

6  are those sentences of Mr. Beech, Mr. Padron, and Misters

7  Muller and Pinto.  Mr. Morales is slightly differently situated

8  than each of those.  So, Mr. Padron received a sentence of 18

9  months.  His personal benefit was considerably greater than

10  Mr. Morales', but the government requested a smaller 5K.

11          Mr. Muller and Mr. Pinto received sentences of 20

12  and 24 months respectively.  Their personal benefits were

13  smaller than Mr. Morales', but those defendants both pled

14  guilty to two counts and received 5Ks that were less than the

15  5K that the government is asking for Mr. Morales.

16          And, finally, Mr. Beech received less money than

17  Mr. Morales did, less than half, and received a 5K of

18  approximately a similar amount.  I think the sentences of

19  Mr. Padron and Mr. Beech are the two most relevant sentences

20  for the Court to consider when fashioning the sentence for

21  Mr. Morales.

22     *THE COURT:*  Let me ask you, with respect to the

23  medical condition and the report of the doctor, do you think

24  that any kind of accommodation is either required or should be

25  considered in light of his medical condition and his episode,

1 cardiac arrest?

2            *MR. BRADYLYONS:*  We certainly think it would be

3 appropriate to consider it.  We don't believe it's required,

4 Your Honor.  I think we have confidence that B.O.P. can handle

5 a great number of medical conditions.  So, it's certainly

6 something to consider, but nevertheless, the government

7 requests a custodial sentence for Mr. Morales.

8            *THE COURT:*  Okay.  Thank you.

9                  All right.  I would like to hear from

10 Mr. Morales, please.

11            *THE DEFENDANT:*  Your Honor --

12            *THE COURT:*  Yes, sir.

13            *THE DEFENDANT:*  -- how are you?

14            *THE COURT:*  Fine.  Thank you.  How are you?

15            *THE DEFENDANT:*  Well, I am here standing in front of

16 you.  First of all, thanks to an opportunity that God gave me,

17 bringing me back from death.  So I owe a big debt to God and to

18 all the people that surrounded me.  That I'm really ashamed to

19 have failed your country, my family, the people who trusted me,

20 which generally a lot of people trust me.

21                  And not one word that is coming from my mouth

22 today, I may not say a lie.  I wanted to say that I'm really,

23 really sorry, that the country that allowed me to come, embrace

24 me and makes me live a different life than I was living.  Being

25 Venezuelan is not easy.  Being Venezuelan is like, not a bad

1  citizenship, where anything can happen from one day to another.
2  We suffer a lot of changes.  Families, they separate.  My
3  sister lives in Germany.  My brother lives in North Carolina.
4  My other sister lives in Paris.  My father is retired and then
5  from son to son, maybe visit one.  And I have my -- glad to
6  have my father here.  He's 97 years old.

7          And they just told me since I was a kid to
8  respect the laws and respect people above all.  I don't have
9  anything else that comes into my mind different, that greed
10 took a moment of weakness from me and, well, I'm really, really
11 sorry.  Because since that moment my life has become a
12 disaster, sir, in many ways, not only the health and my
13 personal life, it's been to tough.  I'm working on amend
14 things, trying to be better and not repeat any of this ever
15 again.  All I can say is I'm sorry.  I have the most respect
16 for the prosecutors' table, I have for my lawyers, for you,
17 Your Honor.  And, well, saying that, I'm sorry.

18          *THE COURT:*  Thank you, Mr. Morales.  Thank you very
19 much.

20          All right.  I think what I'm going to do in this
21 case, I think probably Mr. Beech is the most comparable in
22 terms of culpability in terms of the defendant in this case,
23 and so I think I would ordinarily impose a sentence of 12
24 months and a day, after granting the government's 5K motion and
25 going down farther than they suggested.  I would ordinarily

1    impose a sentence of 12 months and a day, but I think in this

2    case I'm going to do a split sentence.

3              I'm going to do six months in the custody of the

4    Bureau of Prisons and then I'm going to do six months of home

5    confinement.

6              And I do like your idea with respect to the

7    community service.  So during the six months of home

8    confinement, the defendant will be required to perform

9    community service of 120 hours for each of those six months.

10   And I do believe Camillus House is recommended, would probably

11   be -- I'm going to recommend that that community service be

12   serviced -- I'm going to order it to be served there.

13        MR. BINHAK:  Understood.  And we'll reach out to make

14   the arrangements for him to be a volunteer there, so that

15   immediately when he comes out there will be no -- there will

16   just be no break.

17        THE COURT:  All right.  Good.

18        MR. BINHAK:  May I just make one --

19        THE COURT:  Yes.

20        MR. BINHAK:  -- I don't mean to interrupt you, Judge.

21        THE COURT:  No, go ahead.

22        MR. BINHAK:  There's a conceivable issue with

23   immigration law and I just want to build this into what we're

24   doing here.  I'm not trying to reargue your ruling.  I just

25   want to -- I'm not an immigration lawyer.  We do have his

1  immigration lawyer here, Mr. Morales' immigration lawyer.  With

2  this deferred action, it's quite possible that when he goes in,

3  wherever he goes, there will be -- at the B.O.P., there will be

4  a detainer on him and he will have to spend some period of

5  time, maybe an indefinite period of time in immigration hold.

6  And I just want you to understand that so you can -- I don't

7  want him to violate anything by being in the wrong place at the

8  right time.  So, again, I'm not trying to change your mind on

9  what you've done.  I respect your ruling.  I just want to make

10 you aware of that issue so that he doesn't -- he's not

11 somewhere that he can't be at Camillus House because he is --

12 because the Department of Homeland Security.

13           Now, I'm hopeful that the fact that they gave him

14 deferred action and a work -- and they're giving him a work

15 permit, I'm hopeful that the immigration side of the house will

16 be able to work this out and we won't interfere with the

17 sentence that you're going to impose on the J&C.  And, again,

18 I'm not trying to retread anything here.  I just want to make

19 you aware of that issue, so we don't have a problem.

20      *THE COURT:*  Okay.  I think that -- I would imagine the

21 probation officer who's supervising him on his home confinement

22 can probably take care of that issue; and if there are any

23 problems, they would let me know.

24      *PROBATION OFFICER LOREDO:*  Right.  And I'm assuming he

25 will be supervised in Florida where he resides.

1     *THE COURT:*  I'm assuming that as well.

2     *PROBATION OFFICER LOREDO:*  We will have to get with

3     their office to see -- we have in Houston obviously approved

4     agencies.  I don't know if this is one of them.  So what we

5     would like to note in the judgment is that he would be doing

6     community service at Camillus House, if approved by the

7     probation office there.

8     *THE COURT:*  That is correct, yeah.  And if there's a

9     problem with that, then let me know and we can come up with

10    some other agency.

11    *PROBATION OFFICER LOREDO:*  Correct.

12    *THE COURT:*  Okay.  Thank you.  Thank you.

13    All right.  So while on home confinement, the

14    defendant shall not commit another federal, state, or local

15    crime; shall comply with the standard conditions that have been

16    adopted by this Court; abide by any mandatory conditions

17    required by law; and shall comply with the following additional

18    conditions -- let's see.  Wait a minute.  Here we go.

19    All right.  You must provide the probation

20    officer with access to any requested financial information and

21    authorize the release of any financial information.  The

22    Probation Office may share that financial information with the

23    U.S. Attorney's Office.

24    You must not incur any credit card charges or

25    open additional lines of credit without the approval of the

1  probation officer.

2           You must immediately report, continue to report,

3  or surrender to U.S. Immigration and Customs Enforcement and

4  follow all of their instructions and reporting requirements in

5  the event that any duplication proceedings are commenced.

6           You are also -- if you are ordered deported from

7  the United States, then you must remain outside the United

8  States unless legally authorized to reenter.  If you reenter

9  the United States, you must report to the nearest probation

10 office within 72 hours after you return.

11          You must seek proper documentation from U.S.

12 Immigration and Customs Enforcement authorizing you to work in

13 the United States.

14          The Court finds that the defendant does, in fact,

15 have the ability to pay a fine in this case.  Therefore, the

16 Court will impose a fine in the amount of $100,000.

17          It is further ordered that the defendant shall

18 pay to the United States a special assessment of $100 due

19 immediately through the United States District Clerk, Southern

20 District of Texas.

21          Having assessed the defendant's ability to pay,

22 payment of the total criminal monetary penalty shall be due as

23 follows:  The defendant shall begin payment immediately.  Any

24 unpaid balance due will be due in payments of the greater of

25 $25 per quarter or 50 percent of any wages earned while in

```
 1   prison.  The defendant shall receive credit for any payments
 2   made through the Bureau of Prisons Inmate Financial
 3   Responsibility Program.  Any balance remaining after release
 4   from imprisonment shall be paid in monthly installments of
 5   $1,000 to commence 30 days after release to home confinement.
 6   Payments are to be made through the United States District
 7   Clerk, Southern District of Texas.
 8                   I am going to also impose a period of supervised
 9   release after the home confinement of three years.  And I'm
10   going to waive the urinalysis testing and the mandatory
11   conditions.
12                   Let's see.  Do we have an order of forfeiture in
13   this case?
14           MR. BRADYLYONS:  We do, Your Honor.  There's a money
15   judgment has been entered in the amount of $2,534,365.65.
16           THE COURT:  Okay.  So that's taken care of?
17           MR. BRADYLYONS:  Yes, Your Honor.
18           THE COURT:  All right.
19           PROBATION OFFICER LOREDO:  Your Honor --
20           THE COURT:  Yes.
21           PROBATION OFFICER LOREDO:  -- during the period of
22   home confinement, would you like any type of location
23   monitoring to be determined by the probation officer to make
24   sure he is home?
25                   THE COURT:  Yes, I would.  That's a good idea.  Thank
```

1   you.   Thank you.

2           *PROBATION OFFICER HOPKINS:*  Your Honor, just to

3   clarify --

4           *THE COURT:*  Yeah.

5           *PROBATION OFFICER HOPKINS:*  -- the home detention will

6   be served while on supervised release?  There won't be six

7   months of home detention, then three years of SRT?

8           *THE COURT:*  The first six months of the supervised

9   release term will be home confinement.

10          *PROBATION OFFICER HOPKINS:*  Correct.

11          *THE COURT:*  Yes.  Thank you.

12              All right.  Any other clarifications necessary?

13  Good.  Thank you.  I appreciate you doing that.

14          *MR. BRADY LYONS:*  Not from the government, Your Honor.

15          *THE COURT:*  All right.  Anything else?  No, we don't

16  need to dismiss any counts or anything?

17          *MR. BRADY LYONS:*  That's correct, Your Honor.

18          *THE COURT:*  Okay.  Very good.

19              Anything else?

20          *MR. BINHAK:*  Judge, I have a request, if you don't

21  mind.

22          *THE COURT:*  Yes.

23          *MR. BINHAK:*  At least in my neck of the woods, it's

24  appropriate to ask the Court to make a recommendation on a --

25          *THE COURT:*  Placement?

```
 1              MR. BINHAK:  -- place.

 2              THE COURT:  Sure.

 3              MR. BINHAK:  And I absolutely understand and

 4    Mr. Morales understands that it's not binding on the B.O.P.

 5    But there's a -- in South Miami and I will get the name and I

 6    will notify your chambers in the next hour.

 7              THE COURT:  We can put in the judgment as close to

 8    South Miami as possible to the B.O.P.

 9              MR. BINHAK:  Yes, because this way he will be close to

10    his doctors.  There's a camp in -- about 25 miles from his

11    home, south, which will keep him close enough and maybe we

12    could even get a situation where his doctor could visit him and

13    do something like that.  So, I would appreciate that.  And I

14    also I just noticed from the lack of anybody in the room, that

15    I would ask for voluntary surrender but --

16              THE COURT:  Oh, yes, of course.  You're not opposed to

17    it?

18              MR. BRADYLYONS:  No objection, Your Honor.

19              THE COURT:  Okay.  Has he signed the document, Ruth?

20              MR. BINHAK:  No, we haven't.

21              THE COURT:  Okay.  So there's the document to be

22    signed --

23              MR. BINHAK:  Okay.

24              THE COURT:  -- before you leave.

25              MR. BINHAK:  And, Judge, just with regard to what I'd
```

```
1   ask, is a voluntary surrender just sometime after January 5th,

2   6th, so he can do the holidays with his family and then he

3   can -- if he could start --

4            THE COURT:  If you get a reporting date prior to that,

5   just ask me and I'll -- you don't have any objection to that, I

6   assume?

7            MR. BRADYLYONS:  No objection at all.

8            MR. BINHAK:  Thank you, Judge.  We really appreciate

9   it.  Thank you for your time.

10           THE COURT:  All right.  Thank you.

11                Mr. Morales, good luck to you.

12           THE DEFENDANT:  Thank you very much, Your Honor.

13           MR. MARTINEZ:  Thank you, Your Honor.

14           THE COURT:  All right.  Thank you.

15      (Concluded at 12:14 p.m.)

16                          * * *

17  I certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled cause, to the best

19  of my ability.

20

21  /s/ Kathy L. Metzger                    9-2-2022
    Kathy L. Metzger                        Date
22  Court Reporter

23

24

25
```